302 S.E.2d 70

**STATE of West Virginia**

v.

**William G. SCHRADER, Jr.**

No. 14988.

Supreme Court of Appeals of
West Virginia.

March 5, 1982.

Rehearing Denied May 27, 1982.

Brent E. Beveridge, Susan K. McLaughlin, Fairmont, for appellant.

Chauncey H. Browning, Jr., Atty. Gen., and Silas B. Taylor, Asst. Atty. Gen., Charleston, for appellee.

NEELY, Justice.

The appellant, William Schrader, Jr. was found guilty of murder in the first degree without a recommendation of mercy after a jury trial in the Circuit Court of Marion County. The circuit court then sentenced the appellant to life imprisonment in the West Virginia State Penitentiary at Moundsville.

On the morning of 14 December 1977, the appellant went to Frank Millione's Gun and Coin Shop in Marion County to purchase and trade war souvenirs. The appellant asserts that an argument developed between the appellant and the victim after the appellant questioned the authenticity of a German sword that he had previously purchased. During the course of the argument, the appellant stabbed Frank Millione fifty-one times with a hunting knife. At trial the appellant claimed that he had acted in self-defense. He maintained that the victim was known by him to carry weapons and that the victim had reached into his pocket to draw a gun during the course of the argument. The appellant did testify, however, that Mr. Millione never produced any gun from his pocket. Stab wounds were found on the victim's face, head, neck, back, and chest.

When results of a laboratory examination of pieces of the state's evidence were not delivered to the appellant's counsel until four days before the trial, the appellant moved for a continuance. Later, when the trial court gave the prosecuting attorney's file to the appellant's counsel on the day before trial in order to let them inspect for exculpatory evidence, the appellant renewed the motion for a continuance. The trial court then denied the motion.

Before the commencement of jury selection, appellant requested that individual *voir dire* be conducted. Nevertheless, the court proceeded to question the prospective jurors as a group. However, the trial court was willing to ask questions proffered by appellant's counsel.

In its instructions to the jury, the trial court stated that the appellant had the burden of proving self-defense by a preponderance of the evidence. In another instruction the court's definition of "willful, deliberate and premeditated killing" provided that the state need only show that the intention to kill came "into existence for the first time at the time of such killing, or at any time previously."

On these facts the appellant has made four principle assignments of error for our consideration: (1) the trial court erred in refusing to grant a continuance after discovery materials were delivered to the appellant only a few days before the trial; (2) the court erred in refusing the appellant's request for an individual *voir dire* of each juror; (3) the trial court erred in giving its instruction concerning self-defense; and (4) the trial court erred in instructing the jury about the meaning of premeditation.[1]

1. The appellant made eleven other assignments of error which, after a review of the record, we have determined are frivolous and, hence, are not fairly raised. The other assignments were: the State did not inform the appellant of its theory of the case; a photograph of the victim's body was prejudicial; jurors were not sequestered; the court's instruction concerning reasonable doubt was erroneous; the entire prosecuting attorney's office should have been re-

Finding these assignments to be without merit, we affirm.

## I

 With respect to the trial court's refusal to grant a continuance we first recognize that the decision of the trial court in such instances is usually accorded great deference. *See State v. Lucas*, 129 W.Va. 324, 40 S.E.2d 817 (1946). Additionally, we would note that this is not a case in which the appellant was hurried along to trial and thus denied effective assistance of counsel. Rather, this is a case in which the appellant decries the late production of discovery material. However, neither in his brief nor during oral argument, did the appellant show how his counsel could have been better prepared for trial with earlier delivery. At oral argument specific inquiry was made by the court concerning actual prejudice, yet counsel failed to demonstrate how his case would have been improved. Given this absence of even alleged harm caused by the late production, we cannot say that the trial court erred in denying the appellant's motion for a continuance. *See Wilhelm v. Whyte*, 161 W.Va. 67, 239 S.E.2d 735 (1977).

## II

There is a growing body of law in this state to support the use of individual *voir dire* in the jury selection process particularly in cases like this that involve serious offenses and significant publicity. *See, e.g., State v. Payne*, 167 W.Va. 252, 280 S.E.2d 72 (1981); *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978). *State v. Pendry*, 159 W.Va. 738, 227 S.E.2d 210 (1976). Most recently in *State v. Helmick*, 169 W.Va. 94, 286 S.E.2d 245 (1982), we held that, when a juror indicated that she knew the prosecuting attorney, the trial court should have permitted the defense counsel to ask further questions of the individual juror. *Helmick* also holds that, where there has been publicity concerning a crime, the trial court should fashion its *voir dire* in a manner consistent with this Court's recent holdings.

 None of our prior opinions has demanded that individual *voir dire* be permitted in all cases. Instead, we have found individual *voir dire* to be required only when a juror has disclosed a possible area of prejudice. For example, in *State v. Pratt, supra*, we held that it was an abuse of discretion and reversible error when the trial court refused to question individual jurors who had disclosed their acquaintance with police officers. In this case, however, there is no allegation that any specific juror was prejudiced by the pretrial publicity. While we continue to applaud and promote the use of individual *voir dire* in jury selection, we find that in this case where the trial court did use the appellant's proffered questions while addressing the jury members as a group, and was willing to followup with further questions of appellant's counsel, there was no reversible error. Individual *voir dire*, of course, would have been the preferred technique.

## III

The trial court instructed the jury that the appellant had to prove self-defense by a preponderance of the evidence. There is no question that this is no longer the law in West Virginia. In *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978) this Court held in syllabus point 4: "[o]nce there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense." The appellant's trial took place in late September 1978. *Kirtley* was handed down on 28 November 1978. The

cused; statements of the State's witnesses should have been furnished to the appellant before trial; the trial court did not give the jury a standard by which to differentiate between murder in the first degree and murder in the first degree without a recommendation of mercy; the prosecutor's closing argument was improper; the motion for a directed verdict should have been granted; certain evidence obtained from the appellant should have been suppressed; decedent's spouse should not have testified; the motion for a new trial should have been granted. We have carefully considered each of these assignments and find them to lack merit.

question then is whether *Kirtley* applies retroactively to this case.

■ In cases involving other questions of law where we have extended limited retroactivity to a decision, we have usually limited that retroactivity to cases where the point was properly raised at trial and preserved for appeal. For example, the holding in *Edwards v. Leverette*, 163 W.Va. 571, 258 S.E.2d 436 (1979), relating to the burden of proof for an insanity defense, was given retroactive effect in *State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980) and *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979) because the appellants in those cases had properly raised the issue at trial in order to preserve it for appeal.

In *State v. Stalnaker*, 167 W.Va. 225, 279 S.E.2d 416 (1981) we extended limited *Kirtley* retroactivity to cases in the appellate stage at the time *Kirtley* was decided. We note that in *Stalnaker* the appellant had preserved the issue for appeal by raising it as error in his motion to set aside the jury verdict and award a new trial. Furthermore, in *Stalnaker*, the question of self-defense was extremely close.

■ In consonance with the analysis of *Edwards* and in precise accordance with the holding in *State v. Gangwer*, 168 W.Va. 190, 283 S.E.2d 839 (1981), we hold that *Kirtley* should be applied retroactively only to cases where the question of allocating the burden of proof on the issue of self-defense was properly raised below. Hence, we decline to apply *Kirtley* to this case

both because it is not required by our general rules regarding retroactivity and because the error was obviously harmless. Fifty-one stab wounds are hardly consistent with any theory of self-defense. We find, therefore, that the instruction did not constitute reversible error.

## IV

The appellant objects to the portion of the jury charge that read:

I would advise you that to constitute a willful, deliberate and premeditated killing, it is not necessary that the intention to kill should exist for any set length of time prior to the actual killing; it is only necessary that such intention should have come into existence for the first time at the time of such killing, or at any time previously.

The appellant contends that such an instruction takes the "pre" out of "premeditation" and is therefore an inaccurate statement of law. We disagree.

The appellant assumes that premeditation as used in a murder statute has the same meaning as that found in a dictionary. While the meanings of words in a statute are often congruent with their dictionary definitions, this is not necessarily the case when the statute is very old, the language has been unchanged for almost two centuries, and specific words have taken on a particular meaning which is as well known and as much a part of the law as the statute itself.[2] Today we must decide

---

**2.** Since this intrinsically logical observation concerning statutory construction might mistakenly be interpreted as an encroachment on the general rule that criminal statutes are to be construed narrowly, it merits some further discussion. The United States Supreme Court has consistently looked at preenactment history, *e.g.*, *Doherty v. United States*, 404 U.S. 28, 92 S.Ct. 175, 30 L.Ed.2d 149 (1971) (Douglas, J., concurring), post-enactment judicial construction, *e.g.*, *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1947), and applicable common law, *e.g.*, *Musser v. Utah*, 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562 (1948) to decide how to interpret criminal statutes. In *Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1978) Justice Blackmun cautioned, "[a]lthough penal laws are to be construed strictly, they 'ought not to be construed so strict-

ly as to defeat the obvious intention of the legislature.'" We pay particular attention to Justice Marshall's statement that "[r]ather than using terms in their everyday sense, '[t]he law uses familiar legal expressions in their familiar legal sense.'" *Bradley v. United States*, 410 U.S. 605, 610, 93 S.Ct. 1151, 1155, 35 L.Ed.2d 528 (1973). In a similar vein, though in a non-criminal context, the Pennsylvania Supreme Court concluded "[w]hen a term has a well settled meaning within the law of a jurisdiction, it is presumed that the legislature intended to convey such meaning when using the word in a statute." *Commonwealth v. 2101 Cooperative, Inc.*, 408 Pa. 24, 183 A.2d 325, 330 (1962). In these cited cases we find implicit support and encouragement for the historical journey on which we embark in the text in search of the

what the Legislature meant when it used the word "premeditated" to describe first degree murder.

The crime of murder was first divided into degrees in the statute passed by the Pennsylvania Assembly in 1794. That statute used the phrase "willful, deliberate and premeditated" to describe one class of first degree murder. The other types of first degree murder were killings by means of poison, killings by lying in wait, and what we now call felony murder. The purpose of this statute was to limit the use of the death penalty, previously the sole punishment for murder, to only the most heinous of murders. Virginia adopted a similar statute in 1796. *See Wechsler & Michael,* "A Rationale of The Law of Homicide," 37 Colum.L.Rev. 701 (1937).

By the time the West Virginia Legislature adopted the Virginia statute in 1868, the law was settled that in order to constitute a "premeditated" murder an intent to kill need exist only for an instant. The language of that statute, *Code of West Virginia,* Chapter 144, Section 1 [1868], is identical to that of our present murder statute, *W.Va.Code,* 61–2–1 [1923].

The first case to construe the meaning of "premeditated" in such a statute was *Commonwealth v. Mullato Bob,* 4 Dall. 145 (Pa.1795). In that case, Pennsylvania Chief Justice M'Kean noted:

> It has been objected, however, that the amendment of our Penal Code renders premeditation an indispensable ingredient, to constitute murder of the first degree. But still, it must be allowed, that the intention remains as much as ever, the true criterion of the crimes, in Law as well as in Ethics; and the intention of the party can only be collected

from his words and actions.... But, let it be supposed, that a man, without uttering a word, should strike another on the head with an ax, it must, on every principle by which we can judge human actions, be deemed a premeditated violence.

This holding became the foundation for Virginia's law on the issue of premeditation. The note to *Commonwealth v. King,* 2 Va.Cas. 78 (1826) discussed with approval *Mulatto Bob's Case* and a host of other Pennsylvania cases which held essentially that the intent to kill is the essence of first degree murder and that "no time is too short for a wicked man to frame in his mind a scheme for murder, and to contrive the means of accomplishing it." 2 Va.Cas. at 85.

In turn this note was cited as authority by the Virginia Supreme Court when it fashioned the doctrine of *Hunter Hill's Case.* In *Hill v. Commonwealth,* 2 Gratt. 595, 606–07 (Va.1845), the Virginia court wrote that "a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any, or upon very slight provocation, is, *prima facie,* wilful, deliberate, and premeditated killing." [3] In leading up to that conclusion the court noted that proof of deliberation is often difficult for the state to show because a "homicide rarely declares his intention." Recognizing this difficulty the court brandished the rule "[t]hat a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act." *Id.* at 599. Armed with such a rule it was a simple step to conclude that someone's aiming at a victim and then shooting the victim would be evidence that he intended to shoot the person.[4] The court then held that such a shooting would con-

---

legal meaning of "premeditated" as it is found in *W.Va.Code,* 61–2–1 [1923].

**3.** The doctrine of *Hunter Hill's Case* also included the shifting of the burden of proof so that the defendant had to go forward with extenuating evidence to reduce the crime to manslaughter. 2 Gratt. at 607. This sort of presumption gained wide acceptance until it was struck down as being violative of due process in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

**4.** We realize that the presumption of specific intent to kill upon proof of deliberate use of a deadly weapon as set forth in *Hunter Hill's Case* was struck down in *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210 (1976). This does not, however, obviate the usefulness of *Hunter Hill's Case* in divining the legislature's intended meaning of "premeditated" when it used that word in enacting West Virginia's murder statute in 1868.

**6**

stitute wilful, deliberate, and premeditated killing. *Id.* at 600.

■ Hence, when the West Virginia Legislature adopted the Virginia murder statute in 1868, the meaning of "premeditated" as used in the statute was essentially "knowing" and "intentional." Since then, courts have consistently recognized that the mental process necessary to constitute "willful, deliberate and premeditated" murder can be accomplished very quickly or even in the proverbial "twinkling of an eye." *E.g., Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). In fact, Justice Cardozo recommended that the mere exercise of choice by a defendant would justify the inference of deliberation and premeditation necessary to constitute first degree murder. B. Cardozo, "What Medicine Can Do for Law" in *Law and Literature,* 70, 99 (1931). The achievement of a mental state contemplated in a statute such as ours can immediately precede the act of killing. Hence, what is really meant by the language "willful, deliberate and premeditated" in *W. Va. Code,* 61–2–1 [1923] is that the killing be intentional. This conclusion is consistent with Chief Justice M'Kean's assertion in *Commonwealth v. Mullato Bob, supra.* It is also reflected in a previous decision by this Court. In *State v. Hertzog,* 55 W.Va. 74, 80, 46 S.E. 792 (1904), we wrote:

> The distinctive element in wilful, deliberate, and premeditated murder, not in murder of the second degree, is the *specific intention to take life.* Wherever, therefore, in a case of deliberate homicide, there is a specific intention to take life, the offense, if consummated, is murder in the first degree; but if there be no specific intention to take life, it is murder in the second degree. The question whether a particular homicide is murder in the first or second degree is one of fact for the jury.

This exerpt from *Hertzog* points out what really transpires in any homicide trial. Just as the original act in Pennsylvania sought to provide varied punishments for unlawful killings in order for the punishment to fit the crime, so has subsequent judicial interpretation of similar statutes permitted a jury to reach a verdict with the appropriate punishment for the killing in each individual case. A jury's discretion in so fitting the punishment to its view of the culpability of a defendant is comparatively wide.

In a homicide trial the jury is usually presented with a smorgasbord of verdicts with their statutorily prescribed punishments. These various verdicts correspond to different levels of culpability. The lines between the verdicts are thin and hard to distinguish even after centuries of legal scholarship. They are all the more difficult to explain to a jury in one set of instructions. As Justice Cardozo explained while discussing a New York statute similar to the West Virginia homicide statute: "What we have is merely a privilege offered to the jury to find the lesser degree when the suddenness of the intent, the vehemence of the passion, seems to call irresistibly for the exercise of mercy." Cardozo, "What Medicine Can Do for Law" in *Law and Literature,* 70, 100 (1931).

Unfortunately, all of the considerations to which Justice Cardozo alluded that can be subsumed under the category of "culpability" cannot be reduced to neat, prepackaged, jury instructions. The traditional instructions on the subject of murder are continually repeated not because they succeed in converting subjective considerations to objective considerations, but rather because they have always been given and they do about as well in this regard as any other attempt. The instruction objected to in this case has been given for years and has withstood our scrutiny before. *E.g., State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402, (1982) (No. 14904); *State v. Painter,* 135 W.Va. 106, 63 S.E.2d 86 (1950); *State v. Porter,* 98 W.Va. 390, 127 S.E. 386 (1925); *State v. Clifford,* 59 W.Va. 1, 52 S.E. 981 (1906), *State v. Morrison,* 49 W.Va. 210, 38 S.E. 481 (1901).

■ Since the instruction to which the appellant objects is a correct statement of law, and since it was supplemented with further instructions concerning second degree murder and voluntary manslaughter,

we find that the court did not err by giving this instruction. In so ruling we reaffirm Justice Miller's recent opinion in *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402, (1982) (No. 14904) in which he wrote that an instruction similar to that in the present case was adequate when supplemented with instructions which accurately define the other degrees of homicide. We further caution that nothing in this opinion should be taken to mean that the state is relieved of any burden of proof. To convict a defendant of wilful, deliberate and premeditated murder under *W.Va.Code*, 61–2–1 [1923], the state must still prove that the defendant had a conscious intent to kill at the time he executed that intent. *See State v. Hatfield*, 169 W.Va. at 202 n. 7, 286 S.E.2d at 410 n.7.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Marion County is affirmed.

Affirmed.