Raymond Junior HAWKINS, Petitioner,

v.

Howard PAINTER, Warden, Mount
Olive Correctional Complex,
Respondent.

No. CIV.A. 5:98–0997.

United States District Court,
S.D. West Virginia,
Beckley Division.

April 4, 2001.

## MEMORANDUM OPINION AND ORDER

CHAMBERS, District Judge.

This matter comes once again before the Court on review of the Magistrate Judge's Findings and Recommendations. Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. By order dated September 29, 1999, this Court reviewed the objections to Magistrate Judge Feinberg's Findings and Recommendations which recommended to this Court that this case be remanded to the state court for appointment of counsel and an evidentiary hearing. Noting that the Court lacked authority to remand to the state court, this Court referred the case back to the Magistrate for further proceedings. The Magistrate appointed the Federal Public Defender's Office to represent the petitioner. Petitioner's newly appointed counsel reviewed the *pro se* petition and narrowed the issues presented. Thereafter, the Magistrate held a two day evidentiary hearing on the issues raised in the petition. After the hearing, Judge Feinberg submitted her Findings and Recommendations on September 29, 2000. Thereafter, on October 13, 2000, Petitioner submitted objections to the Findings and Recommendations. Upon de novo review of the petitioner's objections and the entire record, the Court **ACCEPTS** in part and **REJECTS** in part the Findings and Recommendations of the Magistrate Judge, but nevertheless **DENIES** Petitioner's Petition for a Writ of Habeas Corpus for the reasons that follow.

This case involves a shooting which occurred at Petitioner's trailer. The facts, as borne out by the record, are as follows. Petitioner, his wife Phyllis Hawkins and their two sons, Anthony and Larry Ray Hawkins, lived in Amandaville in St. Albans, West Virginia. In mid-February, a few days prior to the shooting, the petitioner, along with his two sons, went to a trailer the family owned in a section of Amandaville known as Lock 7. While at the trailer, the boys helped their father change the transmission in his van. At some point, the boys took a gun from underneath the seat in the van and began shooting it at a trash dump located on the property. Petitioner asked the boys to unload the gun and put it back under the front seat of the van. According to Petitioner, he thought that the boys did exactly as he asked and unloaded the gun and put it away.

On the morning of February 18, 1994, the petitioner went to a friend's trailer and began drinking and playing cards. At the time of the trial, Petitioner maintained that he only had a few beers. At the evidentiary hearing, Petitioner claimed he had much more than a few beers, but could not say how many. He also testified at the evidentiary hearing that he may have ingested some drugs, but had no independent recollection of doing so. At some point during the day, Larry Ray came to the trailer. The two began discussing problems they were having with the trailer that they owned on Lock 7. The trailer had no electric or plumbing, thus was not fit for habitation. Apparently, the Board of Health was informed that people had been living in the trailer. Petitioner evicted the tenants, who were friends of Larry Ray. Petitioner decided that he would "get back" at whomever had reported him to

the Board of Health by renting the trailer to an African–American family. According to the petitioner, the people who "lived down on Lock 7 were against the blacks" and would be troubled by having an African–American family living in the neighborhood. (Trial Transcript, 421). Larry Ray and Petitioner got into an argument about renting the trailer, because, according to the petitioner, Larry Ray did not know that Petitioner did not really intend on going through with his plan.

That evening, Petitioner went to Jerry Hawkins' trailer where there were a number of people, mostly family members. Larry Ray and Petitioner again began arguing about renting the trailer to the African–American family. During the argument, Larry Ray flicked his cigarette in the petitioner's eye. Petitioner responded by slamming his fist on the table. Petitioner stood up and left the trailer. He came back moments later to get his keys and his beer. Petitioner left the house once again and drove away in his van. About twenty to thirty minutes later, Petitioner returned to the trailer. He stood in the front yard and called for Larry Ray to come outside. Jerry heard the petitioner calling for his son, and told Larry Ray that his father wanted to see him outside. Larry Ray went outside and within less than a minute a gun shot was heard. Larry Ray ran quickly through the front door, around the coffee table and collapsed in a bedroom adjacent to the living room. Nobody in the trailer immediately knew that Larry Ray had been shot. It was not until his mother lifted his shirt and saw the gunshot wound that it became apparent that Petitioner had shot his son in the chest. Larry Ray died later that night at the hospital.

After the gunshot was heard, Petitioner came to the door and said something to the effect of, "where's he at?" Petitioner then left the scene and hid the gun, along with the clip, under a tarp in the yard of the family's trailer. When officers found the petitioner, he freely took them to the gun. Petitioner told the police a variety of conflicting stories. At the evidentiary hearing, Petitioner tried to explain these conflicting stories by claiming that he did not know that Larry Ray was badly injured and that he was just trying to stall so that Larry Ray could explain everything to the officers. Petitioner went to trial in state court and was found guilty of first degree murder with a recommendation of mercy.

Petitioner exhausted his state court remedies and filed a petition for a writ of habeas corpus in this Court. The Magistrate held an evidentiary hearing, the parties fully briefed the issues and the Magistrate issued proposed Findings and Recommendations. The Petitioner filed objections to the proposed Findings and Recommendations raising two issues. First, Petitioner maintains that the Magistrate erred in recommending that the Court find that Petitioner's counsel at his murder trial were not constitutionally deficient. Second, Petitioner claims that the Magistrate erred in recommending that the Court find that the erroneous jury instructions given by the trial judge amounted to harmless error. Aside from these issues, the Court has reviewed the proposed Findings and Recommendations and, finding no error, adopts and incorporates herein the Magistrate's Findings and Recommendations as they relate to the other issues raised in the petition. The Court will now turn to the petitioner's ineffective assistance of counsel claim and the petitioner's faulty jury instruction claim.

### Ineffective Assistance of Counsel

 Petitioner maintains that his trial counsel were constitutionally ineffective for failing to properly investigate and present evidence which supported the chosen trial defense. As noted by the Magistrate,

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to claims of ineffective assistance of counsel. Under *Strickland,* the Court applies a two-part test. Under this test, the petitioner must prove "that counsel's representation fell below an objective standard of reasonableness," and that the conduct was so prejudicial that the result of the trial was rendered unreliable. *See Strickland,* 466 U.S. at 688, 696, 104 S.Ct. 2052. As the Magistrate correctly notes, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 669, 104 S.Ct. 2052. After a thorough review of the record, the Court concludes that Petitioner has failed to show that his trial counsel were incompetent. This Court is in complete agreement with the Magistrate as to the petitioner's ineffective assistance of counsel claim, and adopts and incorporates herein her Findings and Recommendations as they relate to this claim.

### Jury Instruction

The Magistrate has recommended that the Court find that the errors in the jury instructions constitute harmless error. Petitioner maintains that the Magistrate applied an improper harmless error standard and, in applying the proper standard, the Court must conclude that the error was not harmless.

 The Court must first evaluate the applicability of *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), to the present case. First, the Court adopts and incorporates herein the Findings and Recommendations of the Magistrate as they relate to the application of *Guthrie* under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The Court agrees that Petitioner's case was still pending at the time that *Guthrie* was decided and, therefore, Petitioner is entitled to the benefit of *Guthrie.* Second, the Court finds that the instructions given in this case are substantially similar to those criticized in *Guthrie.* In the state trial, the judge instructed the jury as follows:

"Murder in the First Degree" is committed when any person kills another person unlawfully, willfully, maliciously, deliberately and premeditatedly. As used in these instructions to constitute a willful, deliberate and premeditated killing, it is necessary that the killing was done on purpose and not by accident or without design; the perpetrator must have reflected with a view to determine whether he would kill, and he must have determined to kill as the result of that reflection. However, it is not necessary that the "intention to kill" should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should have come into existence for the first time at the time of such killing, or at any time previously, and continue until the time of the actual killing. An intent to kill need only exist for an instant.

(Trial Transcript, 490–91). In *Guthrie,* the West Virginia Supreme Court of Appeals criticized the so-called *Clifford* instruction and the so-called *Schrader* instruction.[1]

---

1. As the Magistrate notes, the *Clifford* instruction derives from *State v. Clifford,* 52 S.E. 981 (1906) and is as follows:

The Court instructs the jury that to constitute a willful, deliberate and premeditated killing, it is not necessary that the intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should have come into existence for the first time at the

time of such killing, or at any time previously.

*State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163, 178 (1995) *citing Clifford.* The *Schrader* instruction derives from *State v. Schrader,* 172 W.Va. 1, 302 S.E.2d 70 (1982) and is as follows:

The Court instructs the jury that in order to constitute a "premeditated" murder an intent to kill need exist only for an instant ...

The Court agrees with the Magistrate and adopts and incorporates herein her finding that the *Clifford* instruction was substantially given by the trial court. However, the Court rejects the Magistrate's recommendation that the Court find that the trial court did not give an instruction similar to the so-called *Schrader* instruction. The essence of the *Schrader* instruction is that to constitute premeditated murder, the intent to kill need only exist for an instant and that the terms willful, deliberate and premeditated mean that the killing be intentional. It appears to the Court that the Murder in the First Degree instruction given by the trial court encompassed both definitions presented in the *Schrader* instruction. While it is true that the trial court never used the word "intentional," the court instructed the jury that the killing must be "on purpose" and "not an accident." The Court finds these instructions are substantially similar to the *Schrader* instruction. In light of the foregoing findings, the Court must conclude that the trial court gave erroneous instructions to the jury in Petitioner's murder trial to the extent they were similar to the *Clifford* and *Schrader* instructions.

▆▆▆ Having found that the trial court gave erroneous instructions to the jury, the next issue is what standard of review should apply to review the faulty jury instructions. All parties involved seem to agree that this type of error is subject to harmless error review. This Court agrees as well. *See Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that an omission of an element of an offense or an error in a jury instruction is not a structural error requiring automatic reversal, but rather an error which is amendable to harmless error re-

view). However, the parties diverge on what constitutes the proper harmless error standard. Petitioner maintains that the standard is the harmless error standard articulated by the United States Supreme Court in *Neder*. Under this standard, the Court must undertake a complex analysis which focuses on whether, if the omitted or erroneous element of the jury instruction was at issue at trial, there is evidence in the record that could support a contrary finding. If no such evidence exists after a review of the record, the error is harmless. The State maintains, on the other hand, that the standard which should be applied is the harmless error standard articulated in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under this standard, the question is whether the error had a substantial and injurious effect or influence on the jury verdict. If the court concludes that it did not, the error is harmless. The Magistrate, in her Findings and Recommendations, applied the harmless beyond a reasonable doubt standard articulated in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). After careful review, the Court finds that the Magistrate erred in applying the harmless beyond a reasonable doubt standard.

In *Brecht,* the Supreme Court made clear that in reviewing a claim that a prosecutor used a defendant's post-Miranda silence against him, the *Chapman* harmless error standard does not apply in habeas review. The Court noted that "[s]tate courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman,*" the Court continued, "it scarcely seems logical to require federal habeas

---

The Court instructs the jury that what is meant by the language willful, deliberate and premeditated is that the killing be intentional.

*Guthrie,* 461 S.E.2d at 179 *citing Schrader.*

courts to engage in the identical approach to harmless-error review that Chapman requires state courts to engage in on direct review." *Brecht*, 507 U.S. at 636, 113 S.Ct. 1710. This language suggests that a standard less stringent than *Chapman* should also apply to the constitutional error alleged in this case.[2]

Although Petitioner makes a commendable effort to persuade the Court that the *Neder* standard should be applied, the Court finds that the Supreme Court, as well as Fourth Circuit cases, direct a less stringent harmless error standard. The Court agrees with the petitioner that the test articulated in *Neder* generally applies to the review of an erroneous or omitted jury instruction. *See Neder*, 527 U.S. at 18–19, 119 S.Ct. 1827; *United States v. Brown*, 202 F.3d 691 (4th Cir.2000). The *Neder* and *Brown* courts, however, were applying the harmless error review standard on direct review of a defendant's conviction. The Supreme Court has made clear, as noted above, that "collateral review is different from direct review." *Brecht*, 507 U.S. at 633, 113 S.Ct. 1710. In noting the distinction, the Court recognized that, "the role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Brecht*, 507 U.S. at 633, 113 S.Ct. 1710. In the case of collateral review, as is the case here, the Fourth Circuit favors the standard articulated in *Brecht* in reviewing whether an alleged error is harmless. *See Sherman v. Smith*, 89 F.3d 1134 (4th Cir.1996). The Court, therefore, concludes that the standard it must apply in determining whether the error in this case was harmless is whether the error had a substantial and injurious effect or influence in determining the jury verdict. *See Brecht*, 507 U.S. at 638, 113 S.Ct. 1710. In order to determine whether the instructional error was harmless under *Brecht*, the Court must analyze the exact nature of the error as it relates to the jury's verdict.

■ The error identified in *Guthrie* relating to the instructions is that they do not appraise the jury of the difference between first and second degree murder. *See Guthrie*, 461 S.E.2d at 179. Specifically, the *Guthrie* court identified the confusion as stemming from the fact that the instructions allowed the State to prove premeditation and deliberation by only showing that the intention to kill came into existence for the first time at the time of the killing. *See id.* at 181. While the petitioner contested the fact that he intended to kill his son, Larry Ray, his theory in his defense was that the shooting was an accident. The State's theory of the case was not that the petitioner premeditated and deliberated on the killing simultaneously with forming the intent to kill.[3] Rather, the State's theory, which was supported by overwhelming evidence, was that, in the heat of argument, the petitioner left the trailer, drove home, came back with the gun, and then shot and killed his son. According to the State, it was during the twenty to thirty minutes it took the petitioner to leave the trailer and come back that the petitioner premeditated, deliberated and formulated the intent to kill his son.

The Court recognizes the petitioner's argument that other facts, such as not having the clip in the gun, the fact that

---

**2.** It may be argued that since the state court never applied the *Chapman* standard in this case, the federal court should apply it. However, this argument was squarely rejected in *Sherman v. Smith*, 89 F.3d 1134 (4th Cir. 1996).

**3.** Indeed, if the facts supported this type of situation, the Court may be inclined to issue the writ. For example, if the petitioner had shot Larry directly after he was hit in the eye with the cigarette, this may be a different case.

the witnesses did not perceive any danger and that the witnesses thought that the argument was over, may weigh against a finding of intent and suggest this was an accidental shooting. However, despite the erroneous instruction, the jury was also instructed that "to constitute a willful, deliberate and premeditated killing, it was necessary that the killing was done on purpose and not by accident or without design ..." (Trial Transcript, 490–91). This suggests to the Court that the jury, in making a finding of guilt as to first degree murder, simply rejected the petitioner's theory of the case, finding that the shooting was not an accident and that the petitioner intended to kill his son. This case is not one where the facts suggest that a jury would have to determine that the premeditation occurred at the same instant the intent to kill was formulated—the problem with which *Guthrie* was concerned.

The facts, based on a thorough review of the record, suggest the following sequence of events. Petitioner and his son were drinking during most of the day. They were also arguing on and off during the day about renting a trailer that the family owned. Later in the evening the petitioner went to his brother's trailer and began arguing again with Larry. Larry flicked a cigarette in the petitioner's eye. The petitioner got up, walked out of the trailer, came back in the trailer for his keys and beer and left again. As many as thirty minutes elapsed. The petitioner returned with a gun.[4] He told his brother to tell Larry that he wanted to talk to him. Larry came outside and about a minute later a gunshot was heard by the family members that were inside the trailer. Petitioner then came to the door and said something to the effect of, "where's he at?"[5] Petitioner then gave a variety of conflicting statements to the police. Given the facts in this case and the theories of the case on both the State and the petitioner's sides at the murder trial, this Court concludes that the erroneous jury instruction did not have a substantial and injurious effect or influence in determining the jury verdict. As previously noted, this case is not one where the facts suggest the a jury would have to determine that the premeditation occurred at the same instant the intent to kill was formulated—the problem with which *Guthrie* was concerned. Rather the jury, in reaching its verdict, implicitly found that the time period between leaving the trailer and coming back with a gun was the time in which the petitioner reflected on his intent to kill. Although the defense presented evidence that Petitioner did not have the requisite intent, it is not for this Court to replace the jury's judgement with its own. The Court finds that the erroneous jury instructions constitutes harmless error.

For the foregoing reasons, the Court **ACCEPTS** in part and **REJECTS** in part the Findings and Recommendations of the Magistrate Judge. The Court **DENIES** Petitioner's Petition for a Writ of Habeas

---

**4.** The petitioner's own testimony was that he waited outside the trailer because if his wife would have seen the gun, she would have called the police. Interestingly, the petitioner's wife testified at trial that she would hide the gun from the petitioner, "because [she] was afraid [her sons and husband] would get out and get in an argument and come back if they knew where the gun was at." (Trial Transcript, 382).

**5.** The testimony conflicts as to what exactly the petitioner said when he came to the door. Michele Hawkins testified that the petitioner said, "Where's that mother fucker at, I'll shoot him again." Jerry Hawkins testified that the defendant said, "Where's he at so I can shoot him again." Other witness who were in the trailer either said they did not hear the petitioner say anything, or were not asked whether or not the petitioner said anything.

Corpus. The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and to any unrepresented parties.