# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 18-1129** (Ritchie County 17-F-48)

**Burton L. Anderson, Jr.,**
**Defendant Below, Petitioner**

**FILED**
**June 18, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Burton L. Anderson, Jr., by counsel David C. Glover, appeals his convictions of one count of malicious assault and one count of attempted first degree murder.  Respondent State of West Virginia, by counsel Mary Beth Niday, filed a response.  Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

On March 9, 2016, the victim, Larry "Bubby" Foster, Jr. ("Mr. Foster"), was driving his motorcycle uphill on Mayberry Run Road.  At the same time, petitioner was driving his pick-up truck in the opposite direction on the same dirt road.  A collision occurred between Mr. Foster's motorcycle and petitioner's truck.  During the October 2017 term, the Grand Jury of Ritchie County, West Virginia, returned an indictment against petitioner. The indictment alleged that in March of 2016 petitioner committed malicious assault "by unlawfully, feloniously, intentionally[,] and maliciously causing bodily injury to [Mr. Foster] by driving over [him] with his truck, with the intent to permanently maim, disfigure, disable, or kill [Mr. Foster.]"  Additionally, the indictment alleged that in March of 2016 petitioner committed two counts of attempted first degree murder "by unlawfully, feloniously, willfully, maliciously, deliberately, and premeditatedly attempting to kill [Mr. Foster.]"

Prior to trial, on November 15, 2017, petitioner filed two motions.  Petitioner's first motion *in limine* sought to preclude West Virginia State Trooper Corporal Jason Brewer from testifying as an expert witness regarding certain statements in his police report.  Petitioner's second motion sought to dismiss count one, malicious assault, of the indictment because Mr. Foster had not sustained serious bodily injury to support the charge.[1]  The circuit court held a hearing on

---

[1] The motion to dismiss references that pictures of Mr. Foster's injuries were attached, but these pictures were not included with the record on appeal.

petitioner's motions the same day. The circuit court granted petitioner's motion regarding Corporal Brewer's testimony and ruled that Corporal Brewer could not testify as an expert witness. Next, the circuit court took up petitioner's motion to dismiss the malicious assault count in the indictment. Petitioner, citing to *State v. George*, 185 W. Va. 539, 408 S.E.2d 291 (1991), argued that the State was required to prove serious bodily injury. In response, the State asserted that petitioner's argument was inconsistent with the statute because it requires only bodily injury. The circuit court did not rule on the motion to dismiss at the hearing, however, subsequently, on the first day of trial, it denied the motion to dismiss.

Furthermore, during the November 15, 2017 pre-trial hearing, the circuit court took up the State's motion to present Rule 404(b) evidence involving a West Virginia Department of Natural Resources ("DNR") investigation and subsequent search at petitioner's residence on November 8, 2015, for evidence of spotlighting deer.[2] The circuit court heard testimony from two witnesses: Mr. Foster and DNR Sergeant Dwayne Duffield. Mr. Foster testified to the following. He and petitioner had been friends for approximately ten years. On November 8, 2015, Mr. Foster was at petitioner's residence when it was raided by the DNR. At the time of the raid, Mr. Foster was in petitioner's garage with several other individuals. After the DNR officers seized five deer heads, they questioned Mr. Foster alone regarding deer meat in a tote and deer heads that were found. Petitioner was arrested by the DNR that same evening. After the raid, Mr. Foster observed that throughout the next few months petitioner began acting strangely towards him, and several of his friends advised him that petitioner was calling him a "rat." Sergeant Duffield also testified during the pre-trial hearing to the following. He received a search warrant for petitioner's residence after obtaining information that petitioner allegedly had illegally killed and possessed deer. Sergeant Duffield questioned petitioner on November 8, 2015, and obtained his statement and admission to illegally spotlighting and killing deer. The circuit court found it proper for the State to introduce the Rule 404(b) evidence as to petitioner's motive. Petitioner then argued that the evidence was more prejudicial than probative. However, the circuit court found that the evidence was relevant, part of the *res gestae*, and that the probative value of the evidence outweighed any prejudice to petitioner. Furthermore, the circuit court noted that the evidence shall be limited to Mr. Foster's knowledge regarding petitioner's arrest and search warrant for the DNR violations. The circuit court ruled that the State may introduce evidence regarding the arrest and investigation of the DNR charges.

A jury trial commenced on November 27, 2017, on all counts of the indictment. On the morning of the first day of trial, petitioner orally moved for a continuance of the trial contending that there was a West Virginia State Police Lab report regarding digital video recording ("DVR") footage[3] that had been issued in April of 2016, but that it was not produced to petitioner until the Saturday (two days before) prior to trial via a picture through text message. Counsel for petitioner

---

[2] This motion was not included in the appendix on appeal.

[3] Petitioner allegedly had eight security cameras at his residence that all connected to a DVR system. In March of 2016, the State had executed a search warrant at petitioner's residence and taken the DVR system.

indicated that he had originally believed that the DVR footage for the day in question had been erased; however, the report he received on that Saturday indicated that the DVR system was password protected and it could not be viewed. The State opposed the continuance. Prior to ruling, the circuit court gave petitioner, who knew the password, and the State time to view the DVR footage. After both parties viewed the DVR footage, the State represented to the circuit court that there were no recordings on the DVR from the date of the incident at issue or before; the DVR footage starts the very next day. The parties confirmed that the dates and times of the footage were accurate with a potential twenty minute difference. The State also asserted that the existence of this hard drive had always been known and disclosed to petitioner. Petitioner continued to argue that a continuance was necessary in order for him to have the DVR footage analyzed to try to "pull off" any additional footage. After hearing the additional argument, the circuit court denied the motion because, despite the late disclosure of the report, petitioner was in exactly the same position as he was before receiving the report.[4]

During the presentation of its case-in-chief, the State presented seven witnesses. First, Justin Simmons, a 911 dispatcher, testified that he took a 911 call on March 9, 2016, regarding the incident at issue. Mr. Simmons indicated that the 911 recording of the three calls regarding this incident was a true and accurate representation. Second, Corporal Brewer testified that he responded to the incident on March 9, 2016, after a 911 call at approximately 4:00 p.m. from Patricia Nutter that Mr. Foster had been hit on his motorcycle on Mayberry Run Road by another neighbor's truck driven by petitioner, in Ritchie County, West Virginia. Pursuant to Corporal Brewer's investigation, he heard that there were two more 911 calls. Shortly after the first 911 call by Mrs. Nutter, Mrs. Anderson, petitioner's wife, called 911 to report that her husband had been hit by Mr. Foster. In order to obtain additional details 911 called Mrs. Anderson back. However, petitioner spoke with the 911 operator at that time. Petitioner indicated that Mr. Foster had been threatening him for the last few months and that he had heard Mr. Foster was out on some property of his. Petitioner was driving down the road when Mr. Foster came "flying through on a dirt bike, couldn't get stopped, [and] slammed into [petitioner's] freaking truck[.]" Corporal Brewer first checked on Mr. Foster's condition at Mrs. Nutter's residence and noticed some markings on Mr. Foster's chest at that time, but did not interview him because Emergency Medical Services had arrived. Corporal Brewer continued his investigation by examining the scene and the vehicles involved, including taking pictures of the road and the vehicles. Then, Corporal Brewer took the recorded statement of petitioner which was published to the jury. In the recorded statement petitioner told Corporal Brewer the following: that he left his driveway to go retrieve some automobile parts; at one point, he looked up and saw a motorcycle "flying at [him] at a high rate of speed"; that he tried to get off the side of the road but the motorcycle slid into him; and Mr. Foster was out of control weaving back and forth across the road.[5] Petitioner further stated that,

---

[4] Following voir dire, petitioner requested the circuit court allow him to take the computer with the DVR footage to his computer technician that same evening. The State did not object to the examination that evening, but did object to the issues regarding chain of custody. The record is unclear as to what occurred after this exchange.

[5] However, Corporal Brewer testified at trial that he was unable to find any evidence that Mr. Foster had been swerving.

3

during the relevant time, he had a passenger in his truck, Joey, who was messing with the radio.[6] Corporal Brewer questioned petitioner as to why he did not slam on his brakes or pull off on the right-hand side of the road; however, petitioner stated that he did not know what to do except try to go to the left. Petitioner told Corporal Brewer that he thought he hit his brakes, but Corporal Brewer did not see any sign of brake marks on the road. After the incident, petitioner saw it was Mr. Foster, yelled profanities at him, and went home to call 911. Petitioner indicated that up until then, he had no idea who was on the motorcycle. Following the publishing of the recorded statement, Corporal Brewer testified that he observed abrasions to Mr. Foster's chest, arm, and leg as a result of the incident, but no other medical issues. Corporal Brewer did testify that Mr. Foster had a reputation for driving dirt bikes fast. Petitioner then attempted to ask Corporal Brewer about Mr. Foster's driving record and his status as driving on a suspended license; however, the circuit court found this line of questioning to be irrelevant because "[w]hether he was lawfully authorized to drive has nothing to do with the matters that have been testified to with regard to Mr. Foster's reputation by the officer."

Next, Mr. Foster testified during trial that he and petitioner had been friends for approximately ten years. The two were close and would "hangout" at least four times a week at petitioner's home. The friendship began tapering off around November of 2015 after the DNR raided petitioner's residence. Mr. Foster and petitioner had been spotlighting deer, and, at some point thereafter an investigation was opened by the DNR. In November of 2015, on the night the DNR raided the home, Mr. Foster had been at the home for approximately ten minutes prior to several DNR officers storming into the home. There were multiple individuals in the garage hanging out who were pulled out. Petitioner was handcuffed. Later that evening, Mr. Foster was singled out and questioned by the officers.[7] Mr. Foster testified that after the raid he spoke to petitioner a few times, but noticed that petitioner began acting differently. Mr. Foster began hearing rumors that petitioner was saying Mr. Foster had "ratted him out" and that he was the reason his home had been raided. Mr. Foster then testified regarding the events of March 9, 2016. He was riding his dirt bike on Mayberry Run Road, where petitioner lives, to visit a friend, Wenona Danks. Because Ms. Danks lived in a cabin located on petitioner's property, she suggested they meet further down the road and off of petitioner's property. Mr. Foster testified that when he left visiting with Ms. Danks he was driving up the hill when he saw petitioner coming downhill. Mr. Foster noticed that

> the closer we got the further toward my side of the road he came. So I started applying brakes to my bike, and [] he didn't seem to be braking; he seemed to be speeding up to me. So I got as far to the right of the road as I could.

Mr. Foster was knocked off of his bike and proceeded to walk to Ms. Nutter's home to get help. As he was walking to Ms. Nutter's home, Mr. Foster heard petitioner's truck coming up behind

---

[6] During trial, Joseph Broce testified that this statement was a lie and he was not riding in the truck with petitioner at that time.

[7] At this point, the circuit court gave a cautionary instruction that the evidence was being admitted for a limited purpose only of determining whether the State had proven and established a motive of petitioner.

him again at a high rate of speed. Mr. Foster then jumped over a fence. Petitioner pulled his truck beside the fence and allegedly screamed out the window, "I'm going to f***ing kill you, rat." When Mr. Foster made it to Ms. Nutter's home, he had trouble breathing and collapsed on the kitchen floor. Mr. Foster testified he had abrasions on his leg and chest and back pain.

On cross-examination, Mr. Foster acknowledged that he was a convicted felon for manufacturing or delivery of marijuana. Additionally, on cross-examination, petitioner's counsel attempted to elicit certain testimony regarding Mr. Foster and his relationship with the State Police. The circuit court did not allow this line of questioning to go forward. The circuit court noted that if petitioner's counsel had any objective proof that there was any kind of conspiracy or any facts to support that assertion so as to permit the court to find that line of questioning would be relevant, the court would hold an *in camera* hearing.

Then, Sergeant Duffield testified regarding the DNR investigation. Petitioner objected to this testimony being cumulative. The State argued that this testimony was necessary to prove motive. The circuit court allowed the testimony because Sergeant Duffield, as a DNR officer, would have the most official role and knowledge of the actual investigation. Sergeant Duffield testified that petitioner admitted to spotlighting deer and that petitioner was arrested. Once again the circuit court gave a limiting instruction. Next, Joseph Broce testified that on March 9, 2016, petitioner came to him and stated that he had just hit somebody on a dirt bike. Petitioner told Mr. Broce to get in his truck and go back up the road with him. It appeared to Mr. Broce that petitioner was driving back to hit Mr. Foster. When Mr. Broce first was questioned by law enforcement, he recounted one version of events, but later changed his story. Specifically, he admitted to Corporal Brewer that he was not in the truck with petitioner during the initial impact with Mr. Foster. Mr. Broce said he initially had lied to law enforcement because petitioner had asked him to do so. Then, Wenona Danks testified that on multiple occasions petitioner had told her that Mr. Foster was a rat and he was going to kill him. Last, Patricia Nutter testified that she witnessed Mr. Foster's injuries after the incident and that he seemed fearful for his life.

During petitioner's case-in-chief, he presented five witnesses. First, Gordy Marks testified that he did not know Mr. Foster, but on March 9, 2016, he saw someone on a motorcycle going up and down the Mayberry Run Road at an excessive speed. Next, Corporal Brewer was called to testify again to introduce and play a digital recording of Mr. Foster's March 9, 2016 statement to Corporal Brewer. Then, petitioner testified on his own behalf. Specifically, petitioner testified that he had known Mr. Foster for several years. Following the DNR raid, Mr. Foster continued to come around to his home for quite some time before Mr. Foster started to shy off. On March 9, 2016, petitioner testified that he was working on vehicles in the garage at his home. Joseph Broce was there for a portion of the time but then left to retrieve a car part. Petitioner testified that he felt it had been a long time since Mr. Broce left, so he got into his truck to find Mr. Broce. Petitioner stated that he was driving down the left-hand side of the road because of the terrain of the road, "like everybody else does." When he looked up, he saw the motorcycle "flying" down the road. Petitioner said at first the motorcycle was on the right-hand side of the road, and then, in a split second, the motorcycle went to the middle of the road. After some time, petitioner finally saw that the person he had collided with was Mr. Foster. Mr. Foster then looked at him and said, "Look who's going to screw your insurance today, mother f***er." Petitioner testified he became upset and angry and called him a "no good, low life." Petitioner thought he was going to need a

witness so he went to pick up Mr. Broce. He then drove back up the hill and saw Mr. Foster jump a fence. Petitioner leaned out his car and began yelling profanities at Mr. Foster. Petitioner testified that he did not admit to Sergeant Duffield that he spotlighted deer and denied telling people that Mr. Foster "ratted" him out to the DNR. Next, Christopher Payne, petitioner's reconstructionist expert witness, testified. Mr. Payne stated that petitioner's reaction to drive to the left was reasonable. Mr. Payne also testified that "it makes sense to me in a common sense approach why he did it" but it "is not very advisable." Then, Dawn Anderson, petitioner's wife, testified regarding her recollections of the March 9 incident. Furthermore, petitioner's counsel asked Mrs. Anderson if her husband used to raise deer. She answered that yes, they used to own a deer farm. At this point, the State objected to relevance, and the circuit court sustained the objection. Last, Corporal Brewer testified again. Petitioner's counsel asked Corporal Brewer if the DNR offenses were misdemeanor offenses, and Corporal Brewer responded yes. Corporal Brewer was asked to describe the difference between a misdemeanor and a felony. The State objected, and the circuit court sustained the objection.

Moreover, during trial, petitioner attempted to admit into evidence video footage of vehicles driving down the left portion of Mayberry Run Road. The video was created by petitioner and contained footage from the three days following the incident. The State objected due to relevance and that the footage was grainy. The jury had also already completed a viewing of the road. The circuit court denied the admission of this video footage because it contained only selected excerpts; it was not necessarily representative and relevant; and there was a reliability and authenticity issue.

Upon the close of evidence, the parties discussed proposed jury instructions. Petitioner objected to the malicious assault instruction on the basis of the definition of bodily injury. Petitioner reiterated his original argument regarding his belief as to what the proper definition of this element is and reiterated that he believed serious bodily injury was required. The circuit court noted that it had overruled petitioner's motion to dismiss and stated that the instruction was consistent with the court's ruling. Accordingly, it did not allow petitioner's proposed instruction.

The jury then deliberated and returned a verdict finding petitioner guilty of one count of attempted first degree murder and one count of malicious assault. The jury acquitted petitioner of the other count of attempted first degree murder.[8] On December 27, 2017, the circuit court entered a Final Judgment Order. Petitioner filed a motion for a new trial,[9] and a hearing was held on

---

[8] Specifically, the jury found petitioner not guilty of count three of the indictment.

[9] In his motion for a new trial, petitioner asserted that the interest of justice required a new trial because the circuit court committed error by (1) allowing the State to introduce Rule 404(b) evidence at trial regarding the alleged DNR violations; (2) denying petitioner's motion to continue the trial on the basis of a late discovery disclosure; (3) refusing petitioner's proposed jury instruction and denying his request that the State was required to prove that the victim suffered serious bodily injury to sustain a malicious assault conviction; (4) refusing to introduce video evidence of vehicles driving Mayberry Run Road; (5) not allowing petitioner to introduce evidence to rebut the State's Rule 404(b) evidence; (6) not allowing petitioner to elicit testimony regarding the seriousness of the allegedly DNR violations; and (7) denying petitioner's motion to dismiss

6

February 21, 2018.  The circuit court denied the motion.  On February 23, 2018, the circuit court held a sentencing hearing.  The circuit court denied petitioner's request for alternative sentencing because petitioner "continually fails to take responsibility for his conduct" and "cannot be rehabilitated and is likely to re-offend and that it is in the best interest of society that the community be protected."  The circuit court sentenced petitioner to not less than two years nor more than ten years on the conviction of malicious assault and to not less than three years nor more than fifteen years on the conviction of attempted first degree murder.  The sentences were ordered to run consecutively.  The circuit court entered an order memorializing the sentencing, but, due to an error in the order, it entered an amended order on May 11, 2018.  No appeal was taken from either the order denying the motion for a new trial or the sentencing order.  Due to issues with previously appointed counsel, the circuit court set a re-sentencing hearing for appeal purposes and entered an order re-sentencing petitioner on December 4, 2018.  It is from these convictions and sentencing order that petitioner now appeals.

On appeal, petitioner asserts thirteen assignments of error, which we will address in turn. However, we generally note that many of petitioner's arguments do not comply with Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure.[10] That rule provides that

> [t]he brief must contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on, under headings that correspond with the assignments of error. The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. The Court may disregard errors that are not adequately supported by specific references to the record on appeal.

W. Va. R. App. P. 10(c)(7). Additionally, in an Administrative Order entered December 10, 2012, *Re: Filings That Do Not Comply With the Rules of Appellate Procedure*, this Court specifically noted that "[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law" are not in compliance with this Court's rules. Further, "[b]riefs with arguments that do not contain a citation to legal authority to support the argument presented and do not 'contain appropriate and specific citations to the record on appeal . . . ' as required by rule 10(c)(7)" are not in compliance with this Court's rules. *Id.* Moreover, as we previously have stated "[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs." *State, Dep't of Health & Human Res., Child Advocate Office on Behalf of Robert Michael B. v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

---

the malicious assault charge on the basis that there was no evidence Mr. Foster suffered from serious bodily injury.

[10] We further note that, with very limited exceptions, petitioner failed to identify the applicable standards of review in contravention of Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure.

In his first assignment of error, petitioner argues that the circuit court erred when it denied his motion to continue the trial on the basis that a West Virginia State Police lab report was not produced to petitioner until the Saturday before his trial. Petitioner contends that the DVR seized from his residence contains exculpatory evidence and was "vitally important to his defense." Furthermore, while he admittedly has no proof, petitioner claims that the State Police destroyed the portion of the DVR footage that showed the incident at issue. Petitioner claims that the original letter he received from the prosecuting attorney advised him "that there was nothing on the hard drive that was removed from [petitioner's] residence." Petitioner asserts that this letter left him with the "impression that there was no footage at all on the DVR." However, a week before trial, petitioner's counsel reached out to the State in order to determine if there were any related police reports. At that time, the State produced a lab report from the State Police that concluded that a password was necessary to view any saved footage from the DVR. Petitioner asserts that despite discovery requests made, this was the first time the State Police report was ever produced to him. Accordingly, he claims he was prejudiced by the late disclosure and ability to fully review the DVR footage.

The State responds that petitioner fails to establish prejudice from the denial of his request for a continuance. Specifically, the State asserts that petitioner was able to view the DVR footage prior to the start of trial, and even after viewing the footage, he was placed in the same position as he was prior to trial: there was no exculpatory evidence on the DVR as the footage that day had been erased. We find that petitioner has failed to comply with Rule 10(c)(7) because he has failed to cite to any case, statute, or any other authority to support his position. Furthermore, petitioner has failed to demonstrate exactly how he was prejudiced. Because petitioner's brief with regard to this assignment of error is inadequate and fails to comply with Rule 10(c)(7), we decline to address this argument on appeal.

Next, petitioner contends that the circuit court erred by allowing the State to introduce Rule 404(b) evidence at trial regarding the alleged DNR violations. Petitioner asserts that the probative value of the Rule 404(b) evidence was substantially outweighed by unfair prejudice. Petitioner further asserts that the testimony of the officer involved in the DNR investigation was cumulative to the victim's testimony relating to the DNR violations. Petitioner admits that the circuit court performed the necessary balancing test and gave a limiting instruction. However, petitioner argues that the "motive" reasoning relied upon by the circuit court was "illegitimate" because there was not a sufficient link between the November 8, 2015 DNR investigation to establish a basis for motive for the March 9, 2016 incident. Petitioner asserts that because the DNR violations were only misdemeanors there was no reason for him to be so enraged that he would want to kill Mr. Foster. Additionally, petitioner argues that there was no evidence that he would have continuously held on to the intent to kill Mr. Foster from November of 2015 to March of 2016. Petitioner further asserts that even if this evidence was relevant, its probative value was substantially outweighed by the prejudicial effect because when the jury heard that petitioner spotlighted deer, they "immediately disliked him." Petitioner argues that "the jury more likely relied on the DNR spotlighting allegations, rather than relying on the evidence regarding the March 9, 2016 incident, in order to find him guilty[.]"[11]

---

[11] We note that petitioner fails to cite to any portion of the record or any law to support this particular contention.

Conversely, the State asserts that

[a] well established exception to [Rule 404(b)], however, is that evidence of another offense chargeable to the defendant is admissible in a criminal case to show motive or intent, if such other offense is similar and near in point of time to, has some logical connection with, and tends to establish the commission of, the specific offense charged against the defendant, and indicates that the specific offense is part of a system of criminal action.

*State v. Moubray*, 139 W. Va. 535, 540, 81 S.E.2d 117, 121 (1954). The State contends that the circuit court appropriately held a pre-trial hearing on the Rule 404(b) evidence. The State further asserts that pursuant to Rules 401 and 402 of the West Virginia Rules of Evidence, this testimony was relevant to establish motive for the attempted murder charge and that the circuit court appropriately conducted the Rule 403 balancing test. Moreover, the limiting instruction was given to the jury.

We previously have stated:

The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

*State v. Jonathan B.*, 230 W. Va. 229, 236, 737 S.E.2d 257, 264 (2012) (quoting *State v. LaRock*, 196 W. Va. 294, 310-11, 470 S.E.2d 613, 629-30 (1996)). We have further explained:

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986)[, *overruled on other grounds by State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990)]. After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should

9

be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

Syl. Pt. 2, *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994).

We find no error. In this case, the State complied with the requirements of *McGinnis*, having demonstrated the specific purpose of the evidence, which was to show motive and intent. Furthermore, in contravention of Rule 10(c)(7), petitioner has failed to provide any citation to the record where he specifically objected in the circuit court that the motive evidence was invalid because there was not a sufficient link between the November 5, 2015 DNR investigation to establish a basis for motive for the March 9, 2016 incident. Accordingly, we decline to review this issue on appeal.

With regard to the Rule 404(b) evidence, petitioner next asserts that the circuit court erred in finding that the prejudicial effect did not outweigh the probative value. As conceded by petitioner, the circuit court did conduct the required balancing test. Furthermore, we agree with the circuit court that the Rule 404(b) evidence admitted at trial was relevant and more probative than prejudicial because it was all a part of the story of the motive. The circuit court further ensured that it would be "properly presented to the jury in a limited fashion so as to indicate what was going on and the basis[.]" Additionally, the circuit court ruled that the "jury will know nothing about the outcome of the offense or the success of the prosecution" of the DNR charges. Furthermore, there is no dispute that during the trial the circuit court gave the required limiting instruction to the jury.

Finally, petitioner argues that the State engaged in "shotgunning" or excessive employment of other crime evidence to convict him. However, we are not persuaded by his argument. Petitioner points to six occasions which discuss the DNR investigation. Significantly, the trial transcript consists of over four-hundred pages and petitioner points to only six pages where this evidence is discussed. On at least one of those six locations, the information was elicited from petitioner's counsel and not the State and on some the information consists only of a one to four sentences. Thus, we find that the circuit court did not err in admitting the evidence.

In his third assignment of error, petitioner asserts that his cross-examination rights under the Confrontation Clause were violated when the circuit court did not allow him to elicit testimony from a West Virginia State Trooper regarding the seriousness of the DNR violations. Petitioner alleges that the seriousness of the penalty for the DNR charges was highly important to his defense of the State's theory of motive. Accordingly, petitioner claims that because the jury was not allowed to hear this line of questioning, it was "left with the impression that [p]etitioner [was] looking at prison time" for the alleged DNR violations which would give more credence to the supposition that petitioner wanted to kill Mr. Foster. The State argues that the Confrontation Clause law cited by petitioner is misplaced because petitioner was not outright denied the right to cross-examine, but rather his cross-examination was limited by the circuit court's ruling. The State further contends that there was no evidence admitted at trial that left the impression with the jury that petitioner was faced with imprisonment for another felony pursuant to the DNR charges, and consequently, there is no indication that petitioner was prejudiced.

10

With regard to the admission or exclusion of evidence we have held that

> "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994).

Syl. Pt. 2, *State v. Doonan*, 220 W. Va. 8, 640 S.E.2d 71 (2006). Furthermore, we have recognized that "the Sixth Amendment to the [United States] Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)." *State v. Williams*, 236 W. Va. 130, 135, 778 S.E.2d 579, 584 (2015) (quoting *Davis v. Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974)). However, this Court has stated that this right is not unbridled and is subject to general rules, as we have previously defined as follows:

> Several basic rules exist as to cross-examination of a witness. The first is that the scope of cross-examination is co-extensive with, and limited by, the material evidence given on direct examination. The second is that a witness may also be cross-examined about matters affecting his credibility. The term "credibility" includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character. The third rule is that the trial judge has discretion as to the extent of cross-examination. Syl. Pt. 4, *State v. Richey*, 171 W. Va. 342, 298 S.E.2d 879 (1982).

*See State v. Barnett*, 226 W. Va. 422, 430, 701 S.E.2d 460, 468 (2010). We have also stated that "[t]rial courts 'retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)." *State v. Wears*, 222 W. Va. 439, 449-50, 665 S.E.2d 273, 283-84 (2008). Moreover, "the topics explored on cross-examination at petitioner's trial were required to be relevant pursuant to Rule 401 of the West Virginia Rules of Evidence." *State v. Perrine*, No. 16-0475, 2017 WL 1535076, at *2 (W. Va. Apr. 28, 2017) (memorandum decision).

In the matter before us, petitioner has failed to demonstrate that the evidence excluded was relevant. Specifically, the line of questioning limited by the circuit court was as follows:

> Q. Now, that was a DNR investigation?
> A. I believe so.
> Q. Those are for misdemeanor offenses?
> A. I believe so.
> Q. And what is the difference between a misdemeanor and a felony? Do you know that?
> Mr. Rogers: Objection, your honor.

11

The Court: Sustained.  Move along, Mr. Carrico.

In particular, petitioner has failed to demonstrate that the State Trooper was an appropriate witness to be able to answer the legal question that he asked or that he had laid the appropriate foundation to ask such a question to this witness.  Consequently, we find that petitioner has failed to demonstrate on appeal that the line of questioning was appropriate and relevant.  Furthermore, petitioner was allowed to cross-examine the State Trooper, but was limited by the circuit court's prior ruling that there would be no testimony regarding the outcome or penalty of the DNR charges.  Moreover, the jury was allowed to hear that petitioner was facing only a misdemeanor charge and not a felony charge.  Accordingly, he has failed to show that the circuit court erred in limiting the cross-examination.[12]

In his fourth assignment of error, petitioner argues that the circuit court erred by not allowing him to introduce evidence into rebut the State's Rule 404(b) evidence at trial. Petitioner states that after the State presented the Rule 404(b) evidence regarding the DNR violations, he attempted to present rebuttal evidence that he was once an owner of a deer farm where he raised deer and was not a "cruel and heartless person who kills innocent deer and does not value the State's wildlife."  He contends that the circuit court's ruling "damaged [his] ability to put on a defense to the jury[.]"  On the other hand, the State contends that

> "[t]he admissibility of evidence as rebuttal is within the sound discretion of the trial court, and the exercise of such discretion does not constitute ground for reversal unless it is prejudicial to the defendant." Syl. pt. 4, *State v. Blankenship*, 137 W. Va. 1, 69 S.E.2d 398 (1952), *overruled on other grounds*, *State v. McAboy*, 160 W. Va. 497, 236 S.E.2d 431, 432 (1977).

Syl. Pt. 4, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983).  The State asserts that there was no evidence admitted at trial that petitioner was heartless or killed innocent deer.  Further, the State argues that Mr. Foster testified that even he had spotlighted deer with petitioner.  Additionally, the State contends that while it objected to the testimony, petitioner's wife did testify that petitioner once owned a deer farm.  Petitioner's argument consists of a very brief two paragraphs, only a single citation to the appendix record, and not a single citation to any case, statute, or any other authority to support his position.  Because petitioner's brief with regard to this assignment of error is inadequate and fails to comply with Rule 10(c)(7), we decline to address this argument on appeal.

In his fifth assignment of error, petitioner contends that the circuit court erred when it refused petitioner's request to introduce into evidence the video surveillance of vehicles driving Mayberry Run Road for the purpose of corroborating petitioner's contention that at the time of the alleged incident vehicles driving in his same direction at that time of year drove on the left-hand

---

[12] We note that we are constrained in our decision on this assignment of error.  Petitioner complained of this issue in his motion for new trial, however, he failed to include the transcript of the hearing which contained the circuit court's specific findings as to this issue in the appendix.  Additionally, we note that petitioner did not file an appeal of the circuit court's denial of his motion for a new trial.

side portion of the road. Petitioner argues that at issue in this matter is what side of the road petitioner was driving on and why he was driving on that side of the road. Specifically, the State used this information to support its argument that there was premeditation involved. However, petitioner had a security camera on his property that showed footage from the three days following the incident. Petitioner claims that the video he had showed approximately 40 vehicles driving down the road on the left-hand side like he had done. Petitioner claims the video was highly relevant and crucial to his defense because it would establish that it was "more likely that [he] was driving down the left side of the dirt road, as he testified, and would attack the State's theory that [he] was on the right side and drove to the left side only when he saw Mr. Foster."

The State responds that the circuit court did not err in refusing to admit the video surveillance footage because the video contained only excerpts that petitioner had compiled of cars driving down the left-hand side of the road. The State further argues that the video was not an accurate depiction of the traffic flow the three days following the incident at issue because it only contained footage of vehicles driving on the left-hand side of the road. Accordingly, the State argues that the circuit court's denial of the video was not an abuse of discretion. We find that petitioner has failed to comply with Rule 10(c)(7) because he has failed to cite to any case, statute, or any other authority to support his position or any standard of review. Because petitioner's brief with regard to this assignment of error is inadequate and fails to comply with Rule 10(c)(7), we decline to address this argument on appeal.

In his sixth assignment of error, petitioner asserts that the circuit court erred by denying his pre-trial motion to dismiss the malicious assault charge on the basis that there was no evidence that the alleged victim suffered from serious bodily injury. In support of his contention, Petitioner argues that pursuant to *State v. George*, 185 W. Va. 539, 408 S.E.2d 291 (1991), in order for bodily injury to constitute a basis for a conviction under the "malicious assault" statute, it must amount to serious bodily injury. Petitioner, relying on West Virginia Code § 61-8B-1(10)[13], asserts that serious bodily injury is "bodily injury which creates a substantial risk of death, which causes serious or prolonged disfigurement, prolonged impairment of health or prolonged loss or impairment of the function of any bodily organ." Petitioner contends that in the present matter, the evidence showed that Mr. Foster received only a few minor abrasions, and no fractures or abnormalities. On the other hand, the State asserts that the malicious assault statute, West Virginia Code § 61-2-9(a), does not require serious bodily injury. The State further argues that the circuit court properly denied petitioner's motion to dismiss because this was a factual determination for the jury.

We previously have held that

> [t]his Court's standard of review concerning a motion to dismiss an indictment is, generally, *de novo*. However, in addition to the *de novo* standard, where the circuit court conducts an evidentiary hearing upon the motion, this

---

[13] West Virginia Code § 61-8B-1(10) provides the definition of "Serious bodily injury" as used in Chapter 61, Article 8B (Sexual Offenses). We note that none of petitioner's convictions, including his malicious assault conviction, arise under this article.

Court's "clearly erroneous" standard of review is invoked concerning the circuit court's findings of fact.

Syl. Pt. 1, *State v. Grimes*, 226 W. Va. 411, 701 S.E.2d 449 (2009).

West Virginia Code § 61-2-9(a) (2014), in relevant part, provides:

If any person maliciously shoot, stab, cut or wound any person, or by any means *cause him or her bodily injury* with intent to maim, disfigure, disable or kill, he or she shall, except where it be otherwise provided, is guilty of a felony and, upon conviction, shall be punished by confinement in a state correctional facility not less than two nor more than ten years. If such act be done unlawfully, but not maliciously, with the intent aforesaid, the offender is guilty of a felony and, upon conviction, shall either be imprisoned in a state correctional facility not less than one nor more than five years, or be confined in jail not exceeding twelve months and fined not exceeding $500.

(Emphasis added). Accordingly, the plain and unambiguous language of the statute requires only bodily injury and not, as petitioner contends, serious bodily injury. Furthermore, this Court has repeatedly construed that the statute requires only bodily injury rather than serious bodily injury. *See Watring v. Anderson*, No. 18-0200, 2019 WL 1223366, at *2 n.5 (W. Va. Mar. 15, 2019) (memorandum decision) ("An individual is guilty of malicious assault when the person 'maliciously shoots, stabs, cuts or wounds any person, or by any means cause him or her bodily injury with intent to maim, disfigure, disable or kill.' W. Va. Code § 61-2-9(a)."); *Mirandy v. Smith*, 237 W. Va. 363, 367-68, 787 S.E.2d 634, 638-39 (2016) ("W. Va. Code § 61-2-9(a), sets forth the crime of malicious assault, providing that '[i]f any person maliciously shoot, stab, cut or wound any person, or by any means cause him bodily injury with intent to maim, disfigure, disable or kill, he shall, except where it is otherwise provided, be guilty of a felony.'"); *State v. McGilton*, 229 W. Va. 554, 565-66, 729 S.E.2d 876, 887-88 (2012) (same). The sole authority relied upon by petitioner is *State v. George*, 185 W. Va. 539, 408 S.E.2d 291 (1991). *George* does contain language that "malicious assault requires proof of serious bodily injury which is not a requirement of attempted murder in the first degree." *State v. George*, 185 W. Va. 539, 543, 408 S.E.2d 291, 295 (1991). However, *George* also discusses the actual language of the statute and states that:

West Virginia Code § 61-2-9 (1978), in pertinent part, defines malicious assault as follows:

(a) If any person maliciously shoot, stab, cut or wound any person, or by any means cause him *bodily injury* with intent to maim, disfigure, disable or kill, he shall, except where it is otherwise provided, be guilty of a felony, and, upon conviction, shall be punished by confinement in the penitentiary not less than two nor more than ten years.

*George*, 185 W. Va. at 543, 408 S.E.2d at 295 (emphasis added). Furthermore, in examining whether double jeopardy had been violated, the *George* Court looked to the language of the jury instructions:

14

*Based upon these statutes, the jury was instructed that malicious wounding required the state to prove that*: 1) the defendant; 2) did unlawfully and maliciously; 3) shoot the victim; 4) *causing bodily injury to the victim*; 5) with the intent to permanently maim, disfigure, disable, or kill the victim. In contrast attempted murder in the first degree required the state to prove that: 1) the defendant; 2) did unlawfully, intentionally, willfully, maliciously, and premeditatedly, or by lying in wait; 3) attempt to kill; 4) the victim.

*Id.* (emphasis added). We previously have recognized that

[t]he plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters." *Hutchison v. City of Huntington*, 198 W. Va. 139, 150, 479 S.E.2d 649, 660 (1996) (citation and internal quotation marks omitted). . . . As we have stressed on numerous occasions, "[i]t is not the province of the courts to make or supervise legislation, and a statute may not, under the guise of interpretation, be modified, revised, amended, distorted, remodeled, or rewritten[.]" *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W. Va. 137, 145, 107 S.E.2d 353, 358 (1959) (citation omitted). *See also* Syl. pt. 3, in part, *West Virginia Health Care Cost Review Auth. v. Boone Mem. Hosp.*, 196 W. Va. 326, 472 S.E.2d 411 (1996) ("If the language of an enactment is clear and within the constitutional authority of the lawmaking body which passed it, courts must read the relevant law according to its unvarnished meaning, without any judicial embroidery.").

*State v. Richards*, 206 W. Va. 573, 577, 526 S.E.2d 539, 543 (1999). Consequently, in *George*, this Court examined the correct statutory language of bodily injury and did not modify, revise, amend, distort, remodel, or rewrite the statutory language of "bodily injury." Moreover, the circuit court appropriately denied petitioner's motion to dismiss because "it's a factual issue for the jury based upon proper instruction to the jury with regard to that offense[.]" Accordingly, given the above, we find that the circuit court did not err.

In his seventh assignment of error, petitioner argues that the circuit court erred by refusing his proposed malicious assault instruction and denying his request that the State was required to prove the victim suffered from serious bodily injury to sustain a conviction of malicious assault. Petitioner claims that the jury was improperly instructed as to the elements that the State must prove for petitioner to be found guilty of malicious assault. Specifically, as discussed above, petitioner asserts that serious bodily injury is required, but the circuit court's instruction contained only that bodily injury must have resulted. The State reasserts its previous argument above arguing that the statute does not require serious bodily injury, and therefore, the circuit court's instruction was proper. Petitioner's argument consists of a very skeletal eight sentences and only a single citation to any case without a significant application of the citation to the facts of this case. Furthermore, as explained above, we find no error in the circuit court's ruling as that bodily injury, not serious bodily injury is required. Accordingly, we find no error.

15

In his eighth and ninth assignments of error, petitioner contends that the circuit court erred when it prohibited any mention that Mr. Foster was charged with driving left of center, fleeing from an officer, and driving on a suspended license a couple of months before the trial in this matter and when it further prohibited any mention of the alleged victim's criminal record which included a DUI conviction and 18 license suspensions by the West Virginia Division of Motor Vehicles. Petitioner asserts that Mr. Foster was driving his motorcycle on the day of the incident without a valid driver's license and, a few weeks prior to trial, he was charged with driving left of center and fleeing from an officer in his truck for several miles. Petitioner attempted to question Mr. Foster during trial about his driving record, but the State objected. According to petitioner, the circuit court improperly ruled in the State's favor because Mr. Foster's driving history was crucial to petitioner's defense, "especially a history showing that Mr. Foster was charged with driving left of center, driving while intoxicated, fleeing from an officer in a vehicle, and a total of 18 license suspensions." Petitioner claims he was prejudiced and his defense was damaged. The State argues that the circuit court properly analyzed the relevancy of the subject evidence pursuant to Rules 401, 402, and 403 of the West Virginia Rules of Evidence, and concluded that the evidence was not relevant to the charges against petitioner. The State argues further that the circuit court did not abuse its discretion and noted that if petitioner came forward with any facts to support his conspiracy theory that the State police were collaborating with Mr. Foster to create a false statement that the court would conduct an *in camera* hearing to determine the admissibility of such evidence. Petitioner's argument for his eighth and ninth assignments of error consists of a very skeletal nine sentences, only a single citation to the appendix record, and not a single citation to any case, statute, or any other authority to support his position. Because petitioner's brief with regard to this assignment of error is inadequate and fails to comply with Rule 10(c)(7), we decline to address these arguments on appeal.

In his tenth assignment of error, petitioner argues that there was insufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that he was guilty of malicious assault and attempted first degree murder. First, with respect to the conviction of attempted murder, petitioner argues that it is inconceivable to suggest that a person has a motive to kill another person over a misdemeanor charge. Accordingly, he argues that he had no motive. Moreover, petitioner asserts that his expert witness, Christopher Payne, testified that the damage to Mr. Foster's motorcycle did not support the allegation that petitioner ran over the motorcycle with his truck. Mr. Payne further testified that steering to the left was an easy angle for navigation and was the most reasonable attempted evasive action in this circumstance. While petitioner readily concedes that an appellate court cannot assess a witness's credibility, he goes on to assert that Mr. Foster was not credible because he is a convicted felon and he previously told inconsistent statements about the incident. Petitioner argues that the only corroborating evidence was the testimony of Ms. Danks, Mr. Foster's girlfriend.[14] Additionally, petitioner argues there was no medical expert testimony that Mr. Foster's injuries were life threatening or that he suffered any injury. Petitioner contends that the State offered no evidence of intent to kill Mr. Foster because "[i]f [p]etitioner intended to kill Mr. Foster, then he surely could have done so." He also argues that the State offered no evidence of premeditation and deliberation because the State failed to present any

---

[14] We note that there is no evidence in the record to support this assertion that Ms. Danks was Mr. Foster's girlfriend, and in fact, the State adamantly disputed at trial that Ms. Danks was Mr. Foster's girlfriend.

evidence demonstrating that petitioner took any time to form the intent to kill Mr. Foster. Finally, petitioner asserts that the State failed to sufficiently establish there was any bodily injury, much less serious bodily injury.

In response, the State contends that it established at trial that petitioner maliciously ran over Mr. Foster. The State claims that the evidence at trial included Mr. Foster's testimony that he had been pulled aside and spoke to the DNR officers during the November of 2015 raid on petitioner's home; multiple individuals testifying that petitioner labeled Mr. Foster as a rat; petitioner caused Mr. Foster bodily injury by running over him with his truck; Mr. Foster sustained abrasions and suffered head and back pain; and petitioner intentionally ran over Mr. Foster with his truck. Next, the State argues that it further established at trial that petitioner committed attempted first degree murder. The State contends that the evidence at trial included the same evidence supporting petitioner's malicious assault conviction in addition to the following: petitioner believed Mr. Foster had ratted him out to the DNR and that he would kill Mr. Foster; he knew Mr. Foster was located on his property; and he did not slow down after hitting Mr. Foster.

As we have consistently said,

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). In reviewing such challenges to the sufficiency of the evidence, this Court

> examine[s] the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.* at syl. pt. 1, in part.

Under the heavy burden outlined in *Guthrie*, we find that there was sufficient evidence to convince a reasonable person of petitioner's guilt beyond a reasonable doubt regarding the malicious assault conviction. With regard to his malicious assault conviction, petitioner asserts that the State failed to sufficiently establish serious bodily injury or bodily injury. As stated above,

17

"a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Guthrie*, at syl. pt. 3, in part. At trial, the State produced evidence that demonstrated that after the incident at issue, Mr. Foster sustained abrasions to his chest, had difficulty breathing, exhibited abrasions on his leg and arm, and suffered back and head pain. Given this testimony, the jury reasonably could have found that Mr. Foster suffered bodily injury inflicted by petitioner. Accordingly, we reject petitioner's claim.

Likewise, we find that there was sufficient evidence to convince a reasonable person of petitioner's guilt beyond a reasonable doubt regarding the attempted first degree murder conviction. First, while petitioner argues that there was insufficient evidence of his intent to kill, upon careful review it is apparent that petitioner is actually challenging the weight afforded to the evidence by the jury. Petitioner complains of the jury's acceptance of the State's theory that the crimes were motivated by Mr. Foster "ratting" him out to the DNR. In particular, petitioner takes issue with the weight and credibility determinations that the jury made with respect to the testimony of Mr. Foster, Ms. Danks, and his own expert witness. However, as conceded by petitioner on appeal, "[c]redibility determinations are for a jury and not an appellate court." *Guthrie*, at syl. pt. 3, in part.

We have further explained that

> [s]uch a review is not a legitimate function of this Court. *See* Syl. pt. 2, *State v. Martin*, 224 W. Va. 577, 687 S.E.2d 360 (2009) ("The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses." (internal quotations and citation omitted)); *Guthrie*, 194 W. Va. 657, 669, 461 S.E.2d 163, 175 ("It is well established that appellate review is not a device for this Court to replace a jury's finding with our own conclusion. On review, we will not weigh evidence or determine credibility."); *Id.*, 194 W. Va. at 670 n. 9, 461 S.E.2d at 176 n. 9 ("An appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact. . . . It is for the jury to decide which witnesses to believe or disbelieve. Once the jury has spoken, this Court may not review the credibility of the witnesses."); Syl. pt. 2, *State v. Bailey*, 151 W. Va. 796, 155 S.E.2d 850 (1967) ("The jury is the trier of the facts and in performing that duty it is the sole judge as to the weight of the evidence and the credibility of the witnesses."); Syl. pt. 1, *State v. Harlow*, 137 W. Va. 251, 71 S.E.2d 330 (1952) ("In the trial of a criminal prosecution, where guilt or innocence depends on conflicting evidence, the weight and credibility of the testimony of any witness is for jury determination.").

*State v. Trail*, 236 W. Va. 167, 187, 778 S.E.2d 616, 636 (2015). In the present case, the jury heard Mr. Foster testify that he and petitioner had spotlighted deer together and that the DNR conducted a search of petitioner's residence on November 8, 2015, including pulling Mr. Foster aside to question him. The jury further heard from multiple witnesses that petitioner labeled Mr. Foster as "a rat" and from at least one witness that petitioner was going to kill "the rat." There was further evidence presented that Petitioner ran over Mr. Foster; Mr. Foster sustained abrasions

to his chest and had difficulty breathing; he exhibited abrasions on his leg and arm; and he suffered back and head pain. The jury was also presented with the testimony of petitioner's expert witness and with further evidence that Mr. Foster had been previously convicted of a felony. It was the jury's role to weigh this evidence and to decide the credibility of all the witnesses. Ultimately, the jury found that petitioner was guilty of first degree murder and malicious assault. This Court will not disturb these weight and credibility determinations made by the jury.

Additionally, petitioner argues that there was insufficient evidence "offered from any medical expert indicating that any of the alleged victim's injuries were life threatening or that the victim suffered any injury." However, petitioner has failed to cite to any authority that requires the State to prove that injuries were life-threatening to establish attempted first degree murder. Petitioner concedes that he is unaware whether such authority even exists. Finally, petitioner argues that even if there was sufficient evidence of petitioner's intent to kill, "the State offered no evidence of premeditation and deliberation."

In Syllabus Point 5 of *Guthrie*, we held that

[a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Id.* at syl. pt. 5. However, we further held in Syllabus Point 6, in part, of *Guthrie* that

[t]he duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder. To the extent that *State v. Schrader*, 172 W. Va. 1, 302 S.E.2d 70 [] (1982), is inconsistent with our holding today, it is expressly overruled.

*Id.* at syl. pt. 6, in part.

In this matter, there was testimony that petitioner thought Mr. Foster had "ratted him out" to the DNR regarding spotlighting deer and that because of that he wanted to kill Mr. Foster. Additionally, there was evidence presented during trial that petitioner knew Mr. Foster was located on his property that day; after hitting Mr. Foster with his truck, petitioner did not slow down his truck or attempt to call 911 for help; and petitioner yelled at Mr. Foster that he was going to kill him. Accordingly, we reject petitioner's claim.

In his eleventh assignment of error, petitioner contends that he was denied a fair trial due to the cumulative effect of a plethora of errors. Petitioner argues that all of his previously stated errors standing alone have merit for his convictions to be set aside. He further contends that all

together these errors reflect that he suffered undue prejudice, potential for jury confusion and misdirection, and misplaced presumptions to his disadvantage. This argument fails because petitioner has failed to demonstrate multiple errors. Moreover, even if he had, petitioner has failed to explain how such errors would have deprived him of a fair trial. As explained throughout this decision, we find that petitioner has failed to demonstrate any error, let alone cumulative error. We have consistently found that the cumulative error doctrine does not apply where no errors are found. *See State v. Knuckles*, 196 W. Va. 416, 426, 473 S.E.2d 131, 141 (1996) ("Cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."). Consequently, we find that petitioner's skeletal cumulative error assertion is also without merit.

In his twelfth assignment of error, petitioner asserts that the circuit court erred when it denied his motion for a new trial. Petitioner contends all of his grounds that were presented in his motion for a new trial were presented on appeal and for the reasons set forth in the respective assignments of error, he should be granted a new trial. Petitioner's motion for a new trial was based upon the same assignments of error presented on appeal. The State argues that none of these assignments of error has any merit. Again, as we have explained, we find that petitioner has failed to demonstrate any error in this appeal. Accordingly, this assignment of error has no merit.

In his last assignment of error, petitioner argues that even if he received a fair trial, the circuit court erred in failing to appropriately sentence him under a lesser alternative statutory sentence. Petitioner argues that the circuit court erred in denying his request for home incarceration. Petitioner was on home incarceration as a condition of bail for approximately one-and-a-half years prior to being convicted. He had no violations during this home incarceration. Finally, petitioner contends he should not be punished for maintaining his innocence. The State argues that sentences are not subject to appellate review.

This Court has previously held that we "review[] sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, in part, *State v. Lucas*, 201 W. Va. 271, 496 S.E.2d 221 (1997). Furthermore, "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syl. Pt. 4, *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (1982). Here, petitioner is essentially arguing that the circuit court abused its discretion in failing to grant his motion for alternative sentencing because the circuit court noted that petitioner had failed to admit his wrongdoing and that further it abused its discretion by sentencing him to consecutive sentences. Petitioner essentially failed to cite to any law to support his position that the circuit court abused its discretion. Furthermore, petitioner does not argue that his sentence violates statutory or constitutional commands or is based on any impermissible factors. We find no error.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 16, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison